Thank you, your honors. Now the court has asked the parties to address whether the EPA's recent notice of its intent to approve the SIP amendment with regard to the district's one-hour ozone attainment contingency measure in any way has an impact on this appeal, and in our view it doesn't for a rather simple straightforward system. The provisions under section 209 E2 for providing an authorization from the preemption provisions for mobile source emissions in the Clean Air Act establish different procedures and substantive requirements that are applicable to the approvals of state implementation plans, and the citations for that, your honor, in addition to 209 E2 are 40 CFR part 1074. Among the other procedural requirements that are applicable are notice and opportunity for hearing. There's been no notice and opportunity for hearing. There's been no request for an authorization from the state of California to have EPA approve the rule 9510 pursuant to 209 E2, so we don't think that the fact that the EPA has announced that they propose to give credit to the district for the emission reductions attributable to rule 9510 has any bearing whatsoever on this case. Now the merits of the issue, of course, are whether rule 9510 adopted by the district is preempted under section 209 E of the Clean Air Act, and in our view clearly it is, and that we believe the case is governed by two principal cases, the Supreme Court decision in Engine Manufacturers Association versus South Coast Air Quality Management District, and this court's decision in Pacific Merchant Fishing versus Goldstein. So the first question is does section 6.1.1 of rule 9510 establish a standard or other requirement as that term is used in the Clean Air Act, and we believe it's clear on the face of the rule that it does. The requirement to reduce emissions from construction equipment by 20 percent of total NOx emissions, 45 percent of particular emissions, again from exhaust. This is a standard as that term is defined by the Supreme Court in South Coast. As you know, Congress did not give us a definition of standard in the Clean Air Act, so the Supreme Court has provided us with that definition. So again, in the way the courts have analyzed the preemption provisions of the Clean Air Act, you start with the plain language of the act itself, obviously, and then you go to the plain language of the statute of rule at issue, and in this case the plain language of the rule at issue, section 6.1.1, refers to exhaust emissions for construction equipment greater than 50 horsepower. In section 6.1.2, it then goes on to say that the required reductions may be obtained through the use of newer lower emitting equipment, use of cleaner fuels, or by retrofitting equipment. So clearly on the face of this rule, the district is targeting emissions from construction equipment. I don't think there can be really any serious question about that. Now the district, of course, argues that it doesn't matter that we've set a numeric emissions reduction requirement that's applicable to construction equipment. What really matters is how we enforce or how we apply that requirement, and their argument, of course, is that we allow a multiplicity of ways to achieve the standard established by the rule, including the payment of the mitigation fee. But that in the Pacific merchant shipping case, where the same argument was made by the California Air Resources Board in that case concerning marine vessel rules, that it wasn't a standard that was preempted under 209 because there was an alternative compliance mechanism. And what this court said was that the Air Resources Board in that case was conflating a standard with the means of compliance. That's what the Supreme Court said in South Coast, that there's a distinction between the standard and the means of compliance with the standard. In this case, clearly rule 9510 establishes a standard and then sets forth different ways that developers, home builders, can comply with the standard, including payment of a mitigation fee. Now the district then goes on to make the that it's a valid rule, a valid in-use regulation. It's not a standard preempted by 209E, but rather it's a valid in-use regulation pursuant to 209D of the Clean Air Act. But again, that argument runs headlong into the reasoning of this court in the Pacific merchant shipping case, where the same in-use regulation were regulating the type of fuel used by marine vessels when they're running auxiliary diesel engines. And the court there said, quote, the plain language of the rules regulates emission, not fuel. That's 517 Fed 3rd at 1115. And finally, section 6.1.1 of rule 9510 can't be saved as an indirect source regulation pursuant to the Clean Air Act, because the Clean Air Act on its face says, quote, direct emission sources or facilities at, within, or associated with any indirect source shall not be deemed indirect sources for purposes of an indirect source review program. And that's 42 U.S.C. section 7410A5D. The preemption provisions of the Clean Air Act, your honors, are meaningless if air districts throughout the country can evade the congressional preemption of a multiplicity of mobile source emission standards in the country simply by characterizing, by setting the standard and then saying, oh, there are different ways that one can comply with the standard. If there's anything that's basic about the statutory scheme of the Clean Air Act as it applies to mobile source emissions, it's that there are no more than two standards, two mobile source emission standards. There's the federal standard established by the Environmental Protection Agency, and there are so-called California standards. But only if the state of California obtains either a waiver for new motor vehicles under 209B or with regard to non-road equipment, they obtain an authorization under 209E. And in this case, the state of California has not applied for an authorization under 209E. They've not made the findings required by 209E2. The EPA has not considered, there's been no notice or opportunity for consideration of whether Rule 9510 would satisfy the statutory requirements for an authorization under 209E2. And so under the district's interpretation, we could have air districts throughout the country adopting a multiplicity of rules like Rule 9510 that instead of just two standards applicable to mobile source emissions, you could potentially have hundreds of different standards applicable to construction equipment, which in our view would establish what the courts have referred to as the anarchic patchwork of regulation of mobile source emissions that Congress clearly intended to prohibit by establishing federal preemption. Now, with regard to the issue of the appellees have urged the court to apply the presumption against preemption. In our view, the presumption against preemption, you never get to a presumption against preemption in this circumstance. And we think that the decision of the Supreme Court in South Coast made that clear. The dissent in South Coast, Justice Souter, urged the court to apply the presumption against preemption and the majority rejected that and said there's no reason to go to the presumption against preemption in the circumstances, in a circumstance where Congress clearly has addressed the issue on the face of the statute. Further, we would say that in this address, the balance of state, federal jurisdiction with regard to the regulation of air emissions in section 7416, 42 U.S.C. 7416 of the Clean Air Act, which is the provision concerning retention of state authority, Congress said except as otherwise provided in and then 7543, which is section 209. So Congress clearly in 7416 said states retain authority with regard to stationary sources subject to meeting the national ambient air quality standards. The federal government retains primacy with regard to mobile source emission standards, except when a state, beginning with California, goes through a process either for a waiver under section 209E2, and neither of those circumstances has occurred. I'd like to reserve our time for rebuttal unless the Court has any questions. Thank you, Your Honor. I missed it, but did you answer the question as to whether 9510 has been adopted? 9510, Your Honor, if you say has been adopted, certainly has been adopted by the district. The Environmental Protection Agency issued a notice of its intent to approve the district's one-hour ozone contingency measures as part of the state implementation plan, and in doing so, to give the state of California credit for the emissions reductions attributable to Rule 9510. So there's, to my knowledge, as we sit here today, there's been no final decision on the SIP, but clearly EPA has issued a notice of their intent to issue that approval with regard to the state implementation plan provisions of the Clean Air Act, but of course, as I said earlier, we think that has no applicability to the issue of whether I know you said you had no applicability, but do we know in respect to this case which ordered that EPA respond by today, has there been any action? I don't know, Your Honor. I assume that the EPA will comply with the court order and will issue a decision. They're under a court order in another case. Yes, Your Honor, I understand that, and that today is the deadline, in fact, for EPA to comply with the court order in that instance. Thank you, Your Honor. I'm one, a little bit worried about whether, about the indirect source review program under the Clean Air Section 110A-5 and the decision that we have out of the, if you will, the D.C. Circuit in 1984 about Natural Resources Defense Council versus the EPA. It seems to me that that decision entails that states with federal approval may impute mobile sources of pollution to an indirect source and require that the indirect source to mitigate those sources, so how do I find my way around that? The way you find your way around that, Your Honor, is distinguishing the kind of regulations that can be adopted in an indirect source program versus establishing an emission standard that's preempted by Section 209. We don't contest that the state of California could adopt an indirect source program, and it could include such things as the classic indirect source program would be restrictions on parking. You would only allow parking facilities to provide parking for people that carpool. I mean, that would be a classic indirect source program, or take a highway circumstance, you could have the state adopt an indirect source program that said highways, municipalities are required to impose tolls or congestion pricing in a way that discourages folks from driving or limits the use of driving. So yes, you can get at, obviously an indirect source program gets at mobile source emissions, but they have to do it within the bounds of what the Clean Air Act allows, and the Clean Air Act does not allow states to do that via establishing a standard applicable to non-road construction equipment. Thank you, Counselor.  Good morning, Your Honor. May it please the Court, Philip Jay, I'm the District Counsel for the San Joaquin Valley Air Pollution District. I agree somewhat on the question of the EPA action that's to be taken today. Theoretically, if they follow the court order. Our understanding is they will take action today. There's two issues involved there. A state implementation plan really is a series of plans like attainment demonstrations, contingency plans, and a series of rules. Districts adopt rules, EPA deals with those separately. They all get conglomerated into this thing that we call the state implementation plan. The action that's subject to the consent decree deals with just approval of this attainment plan. The actual approval of Rule 9510 is a separate action that EPA has pending that is not a subject to the consent decree. Do we have any idea on the timeline on that? Theoretically, EPA has up to one year to deal with submittals, but they're notoriously, I think one case said, laggard in their processes. And these things tend to take longer than what the statute says. We don't have any real good idea of how long that specific review of Rule 9510 is going to take. On the other hand, the fact that the EPA is approving or proposing to approve the district's plan in full indicates, again, another element that we contend is at issue here is that the federal government does not preempt itself. If you have a scheme set up where the federal government gives authority to a state to adopt a specific program, and then in this case where the EPA blesses that plan, it essentially becomes federal law. And so it's not really a question of does section 209 preempt anything? It's a question of how do you read federal laws in harmony? Because in a sense, Rule 9510 becomes federalized because it's part of this plan that the EPA approves, which then becomes essentially federal law. So- Let's assume for the moment that we found that 209 preempted all of this. What then would happen to the EPA's consideration of 9510? I mean, I'm just trying to figure out the practical impact of all this, depending on- Obviously, it would- It's for the sake of you to get alarmed. It would cause problems with the plan. I mean, if this court were to say Rule 9510 is preempted, EPA would have trouble sticking to their finding that they're proposing so far that the district has authority to do this rule. Obviously, if this court said, no, they don't have authority because it's preempted, that would certainly have an effect on EPA's action. The district's contention is Rule 9510 is not an admission standard. If one examines the cases that deal with engine emission standards, they have one thing in common, keeping in mind the premise of engine standards is to not have 50 of them. However, the cases that look at what an engine standard is tend to narrowly construe that definition to a numeric limit placed on a particular engine or class of engines. And then there's usually a prohibition attached to it. You shall not use an engine if it exceeds a certain gram per horsepower rating, or some kind of a physical characteristic of the engine. And that's really set forth well in the South Coast decision, where the court talks about design features, particular controls on the physical characteristics of the engine. Not being able to admit over four grams per horsepower, things of that nature. The focus for engine standards, keeping in mind the theory behind all this, is the tailpipe. What's coming out of the tailpipe because of the configuration, the mechanical characteristics of the engine. On the other hand, the cases say what is not a standard. For example, the Clean Air Act allows what they call in-use standards. And these are not just things like carpool lanes and a stoplight regulating traffic. In-use standards are allowed, and this is one of the engine manufacturers' cases out of Washington, DC. These in-use standards can try to get at emissions. It's an indirect way to basically deal with the aftermath of the pollution that's coming out of the engine. So in-use situations are not confined to just traffic regulation and carpool lanes and things of that nature. They can actually target the requirement to mitigate what comes from the use of the engine. And examples are given in cases. You could limit the use of the engine. You could set operational conditions, fuel requirements, restrictions on where you're allowed to use them. You could prohibit them from certain areas of a state. But the whole idea is to prevent use or mitigate the use of the engine. Rule 9510 really does not have any of the characteristics of that engine standard. Really, all 9510 does is regulate the use of these engines at a site after they come from the manufacturer. Essentially what happens, and this is unrefuted in the record, is the district uses a computer model that looks at the site. And the computer model gives various defaults and makes various assumptions on the site. If you, for example, want to build a 100-unit subdivision, the computer says, okay, well, you're going to disturb this much soil. The model presumes it's going to take you this long to build it. You're going to do this much grading. Once it's operated, so many cars are going to come and go, etc. And then what happens is it gives you a number, what we call a footprint. And then the rule says, okay, here's your footprint. It's really not even necessarily based on your particular fleet or your construction equipment. The district says, you have to reduce this footprint by 20% of the NOx emissions and 45% of the PM10 emissions. And how do you do that? You can mix and match the fleet. There's evidence in the record that any reasonable mixture of old equipment and new equipment can meet this standard. But my worry, counsel, is whether you say this is project-based reductions or equipment-based reductions, there's nonetheless a standard that has to be met, isn't there? Well, there's a standard, but it's not an engine standard. I mean, if you want to use the word standard in a loose sense, any requirement that a government agency makes you comply with could be said to be some kind of a standard. Here, the issue is, is it an engine standard? Does it affect the physical characteristics of the engine? Or is it just regulating the use of this equipment and engines at a site under this indirect source authority? I gather that's similar to what you were doing with the agricultural sites in a different context. A little bit. It's an offset. There's a menu approach. And essentially, you can even mix and match the types of controls. You could put- I mean, it's sort of an ambient air approach, site-specific. I mean, the only question, I think, in front of us is whether or not it's preempted in this instance. And we contend it's not preempted because it's regulating the site and not the engine. In fact, you could increase the densities of the buildings you're building on the site or put bike lanes in, et cetera. And that can be used to offset the emissions from the engines. That's a far cry from requiring a specific gram per horsepower on a particular engine. Essentially, all we're dealing with is looking at the sites. And it's really in concept- But conceivably, it could involve that. Pardon me? Conceivably, it could involve that on a particular site, right? If a developer voluntarily decided, hey, I want to use clean engines, they could do that. We don't dictate any particular configuration of an engine. The developer could use as dirty an engine or as clean an engine that they feel they want to use. The issue is how is the site affected and how do you mitigate that? Right, but in this particular circumstance, I mean, let's assume the configuration, the wind, and all the other factors were such that the only alternative for meeting the standard would be a very clean engine that might, then you'd have to dictate that, wouldn't you? Well, that's certainly not what the evidence in the record is. The evidence in the record is a developer could use a mix of equipment that's as much as 10 or 12 years old to comply with this requirement that your footprint be reduced. It's a usage management type of situation. You could use an older water truck, but maybe a 10-year-old bulldozer, and et cetera. Do that with your fleet, and you could meet this standard. So it's not a hard standard to meet. It really focuses on the site, is really what it does. And it's a different situation than the South Coast and the Pacific shipping case. There, we were dealing with just a straight, you cannot use this engine unless it meets a certain gram per horsepower type of requirement. Here, there's a little overlay here. The federal government, Congress, has given the district the power to regulate indirect sources. It specifically gives the power to do indirectly what you can't do directly. So if section 209 says you can't regulate what's coming out of the tailpipe, well section 110 says yes, but you can regulate indirectly those same effects by in-use requirements, regulating land use, et cetera, to basically get to a result that mitigates the emissions from this equipment. It's the district's contention that Rule 9510 really does comply with the broad authority given by the indirect source authority in the Clean Air Act. Remember, the act is not quite as narrow as the appellants would have the court believe. Congress did, yes, say, we're not going to let you regulate the tailpipes, but they also said, we're going to confirm that states have this broad authority to regulate indirect sources as a land use matter. And they confirmed that, and that's the basis for which the district adopted this rule, is it's this indirect way to regulate emissions. And since the federal- If really, an indirect source review program can impute emissions from mobile sources to the indirect source, then the statute's exclusion of the direct emissions or purpose doesn't. No, it does have a purpose. The appellants really made this up. The indirect source authority in the Clean Air Act says direct emission sources can't be indirect sources. The idea is the indirect source attracts, as a magnet, emission sources, like cars, like construction equipment, things of that nature. The history of the act shows that that term, direct source, way back in the 1977 Clean Air Act amendments, was used interchangeably with stationary source. So what that means is, for example, equipment is not some inherent feature of the land. It's a mobile source that's brought to the land and is considered part of this indirect source criteria. What a direct source would be is, for example, a factory, a refinery, some kind of a stationary boiler, like in a subdivision. A lot of times they have standby generators for power generation, sewer plants, things of that nature. The key there is to show that stationary sources, which are regulated under a completely different regime, they have to get permits and have best available control technology and things like that, are not to be considered indirect sources because they're really an inherent part of the site. They're attached to the site, and that's what a direct source is. And that's illustrated in, there's an NRDC case cited in our brief, where it's the shipping terminal, where the EPA thought, well, we don't have authority over indirect sources, and the court said, well, wait a minute. Yeah, ships coming and going to the terminal are indirect sources. EPA doesn't have authority, somebody else might. But however, look at the terminal operations. They do things like unload fuels, things of that nature. Those could definitely be stationary sources and, by definition, direct sources that EPA could try to regulate through permitting and things of that nature. The analogy here is, in California, gas stations. You know, when you go fill up your car, you have those nozzles on the filling device. That's connected to a vapor recovery system. The district regulates those. They don't regulate the cars that come back and forth, because those are, you know, engine stands. We don't say your engine has to be a certain cleanliness. But once it's refueling at that site, that's considered a direct or stationary source, and that's something that's regulated as a direct source and not as an indirect source. I'd like to cede a minute of our time to the interveners. They might have something to add. I would point out, though, that the presumptions do apply to a preemption of this kind, and really it's more of a preclusion issue. We've got competing federal authorizations here, and the court's job is to read these in a way that harmonizes them and doesn't have section 209, for example, canceling out the indirect source authority of section 110. Thank you. Okay, please, the court. Interveners agree- On the district side this year, huh? Yeah. But isn't the theory the same? No. Tell me why not. Well, because we're not arguing here over whether a menu represents best controls and so on. Right. Interveners actually agree with appellants in that there is a distinction between standards and the means of compliance, and what appellants are doing here is focusing on the fact that one option for compliance is to change the standards or the limits that the equipment meets, but the standard applies to the project. Appellant's argument would have merit if your only option was to change the equipment that you're using, but if you look at the way the rule operates and the credit you get, which includes any change to the project, you can change the hours of use of the equipment, you can change the mix of use, the model makes certain assumptions, and all of those assumptions are subject to change. So this rule doesn't set standards for equipment. You can't certify that your fleet or any piece of equipment meets Rule 9510. You couldn't take it in like smog check and say, you know, give me a stamp of approval for this piece of equipment. It depends on the project itself and the design of the project, and you can change the design of the project in order to meet the standard. In fact, in many cases, even if you had a clean fleet, if you were proposing to do something wholly inefficient with that equipment, theoretically, you know, you'd have to change the project in order to meet the standard. The standard applies to the project, not to the equipment. The fact that there's an option to comply by changing your equipment doesn't change the nature of the standard. Thanks. Okay, thank you. Thank you. Thank you, Your Honor. A couple of points. District's counsel's first point was that somehow the approval of the state implementation plan would somehow federalize this rule is without precedent. There's no authority for that. And we would point out that the Clean Air Act makes a distinction between what are called federal implementation plans and state implementation plans. And those are two different beasts, so this would not- But I think there's a point that if, I mean, we aren't there yet because EPA hasn't acted on it. But, I mean, if EPA blessed all of this, then one presumably would take into account the fact that it believed that it complied with the statute. But there are two different statutory and procedural requirements, Your Honor. And I would tell you that, represent to you that the accepted, long-established regulatory practice with regard to EPA in the State of California is the State of California will start by putting a proposed regulation into a state implementation plan. And they will, on a separate track, seek a waiver under section 209. We read about Pavley standards, which were enhanced standards applicable to cars adopted by the legislature. That went into the state implementation plan in 2007 and only was approved under 209B this past summer. So that's the established regulatory interpretation of the way that works. It would be a radical change to suddenly say that once you get a regulation into a state implementation plan, that constitutes the approval under 209. With regard to council's distinction between construction and operation aspects of the rule, remember, Your Honors, we're only challenging the construction components, the construction equipment components. Yes, there are other aspects of the rule that regulate the operation of the facility, the configuration of the development, etc. That's not before the court. And so you can't confuse those two. The rule clearly sets a construction emission standard for NOx and particular emissions that come out of the tailpipe of construction equipment. Now with regard to the issue of direct emissions, the example that was cited was vessels coming into the harbor. Yes, when those vessels tie up to the harbor and essentially become part of the harbor facility, they're not moving around anymore. The court said, yes, those can be, in that circumstance, stationary sources. That's not what we have going on here. We have bulldozers running around on development sites. We don't have stationary pieces of equipment that are tied to a stationary facility. Finally, Your Honor, with regard to intervener's point about the standard versus the means of compliance. Their argument runs headlong into this court's decision in Pacific Merchant Shipping. They're the Air Resources Board, but there's an alternative means of compliance. Because the rule provides that vessel operators will comply with the rule by using low sulfur fuel. And this court said that that's irrelevant, that the standard is separate from the means of compliance. And that's also what was suggested by the Supreme Court in the South Coast decision. Well, thank you both for your arguments. I think it's a very interesting case in part one, and we'll take it under advisement. Thank you, Your Honor. And with that, we are in adjournment for the morning.
judges: Fletcher B. , Thomas, Smith N. R.